UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:18-CV-00118-HBB

CENTURY ALUMINUM COMPANY,
CENTURY KENTUCKY, INC.,
CENTURY ALUMINUM OF KENTUCKY
GENERAL PARTNERSHIP,
CENTURY ALUMINUM SEBREE LLC,                                    PLAINTIFFS

VS.

CERTIN UNDERWRITERS AT
LLOYD'S LONDON SUBSCRIBING TO
CERTIFICATES NOS. TTH2142217JA,
MIFB06363A17, CA17FV169PSX, MI9383GAA,
17CA287519TA, PO3784917AA,
M19977BAA059, 57974A17AAG,
1665V17OAVNA, 82619O6117JF,
AND 74857K17AA,                                               DEFENDANTS

MEMORANDUM OPINION
AND ORDER

This matter is before the Court on the motion of Defendant Certain Underwriters at Lloyd's London Subscribing to Certificates Nos. TTH2142217JA, MIFB06363A17, CA17FV169PSX, MI9383GAA, 17CA287519TA, PO3784917AA, M19977BAA059, 57974A17AAG, 1665V170AVNA, 82619O6117JF, and 74857K17AA ("Underwriters") for partial summary judgment on the claims for declaratory relief and breach of contract (DN 100). Plaintiffs Century Aluminum Company, Century Kentucky, Inc., Century Aluminum of Kentucky General Partnership and Century Aluminum Sebree LLC (collectively "Century") have responded in opposition (DN 107), and Underwriters has replied (DN 112). The parties have consented to the undersigned's exercise of jurisdiction to conduct all proceedings in the case and enter final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73 (DN 74).

**Nature of the Case**

The operative facts in the case are largely uncontested. Century operates aluminum production plants located in Hawesville and Sebree, Kentucky. In order to produce aluminum, Century requires substantial amounts of raw material, including alumina (DN 1, p. 5). The alumina is shipped from Gramercy, Louisiana, via barges traversing the Mississippi and Ohio Rivers. (DN 107, p. 2-3 and DN 1, p. 5.). Century procured a policy of marine cargo insurance from Underwriters for losses associated with the alumina shipments (DN 1, p. 3).

Beginning September 2017 through January 2018 the U.S. Army Corps of Engineers intermittently closed several locks on the Ohio river for multiple days due to deterioration and malfunction of the lock mechanisms (DN 107 at p. 3-4). During the periods when the locks were closed, Century's barges could not make passage to the aluminum plants. Further, the Corps of Engineers was unable to forecast when and for how long the lock closures might occur. Century asserts that it was essential that it maintain an adequate stock of raw material on hand for continuous aluminum smelting operations. Should operations cease, Century states that the molten material in the electrolytic smelting vessels would solidify in what is known in the industry as "pot-line freeze" (Id. at p. 2-3). Recovering from a pot-line freeze, Century contends, would have resulted in costs in the multiple tens of million dollars (Id. at p. 3).

Century employed three strategies to address the alumina delivery problem. At the time of the lock closures, Century had 11 barges on the Ohio River. One was able to complete the journey to the unloading facility. Of the remaining 10 barges, Century diverted them to other unloading facilities where the alumina was loaded onto trucks to complete the journey to the plants (Id. at p. 5). Second, Century leased specialized rail cars to transport alumina by rail (Id. at p. 5-6). Finally, Century shipped some alumina on barges via the Tenn-Tom waterway, however, this ultimately

2

proved to be an impractical alternative (Id. at p. 6).  Century incurred additional expenses in utilizing these alternative delivery methods between September through December 2017 (DN 1, p. 6).

On November 13, 2017, Century submitted a notice of claim on the Underwriters' policy for "losses associated with shipping alumina and other raw materials by alternate modes of transportation to Century's plants due to lock closures on the Ohio River" (DN 100-1 at p. 3).  The policy included an "Extra Expense Clause" with limits of $1 million dollars and a $25,000 deductible (DN 1-2, p. 11-12).  Underwriters paid Century the total amount available under that clause of $975,000 (DN 1, p. 3-4).  Underwriters took the position that this was the only applicable benefit under the policy (Id. at p. 4).  This action follows, as Century contends that other provisions in the policy of insurance afford coverage for its costs incurred in securing alternative delivery means for the alumina.[1]  Underwriters' motion for summary judgment is limited to Century's claims for declaratory judgment and breach of contract.

## Summary Judgment Standard

Century brings this this action in federal court on the basis of diversity jurisdiction under 28 U.S.C. § 1332. (DN 1). As a result, this Court applies the substantive law of the forum state, Kentucky. See Rawe v. Liberty Mut. Fire. Ins. Co., 462 F.3d 521, 526 (6th Cir. 2006) (citation omitted).  However, federal procedural law will govern as applicable, including establishing the appropriate summary judgment standard. See Weaver v. Caldwell Tanks, Inc., 190 F. App'x 404, 408 (6th Cir. 2006) (citation omitted).

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[1] Century has also asserted causes of action related to the handling of the claim and for bad faith, however those need not be discussed in this Order.

as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Winkler v. Madison Cnty., 893 F.3d 877, 890 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Anderson, 477 U.S. at 256.  Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." Bill Call Ford, Inc. v. Ford Motor Co., 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.  However, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. Matsushita Elec., 475 U.S. at 587 (citation omitted).

## Interpretation of Contracts of Insurance

"A federal court sitting in diversity must apply the substantive law . . . of the state in which it sits." Phelps v. McClellan, 30 F.3d 658, 661 (6th Cir. 1994).  Under Kentucky law, the party seeking to establish coverage bears the burden of establishing that the incident at issue was within the scope of the policy.  North American Acc. Ins. Co. v. White, 80 S.W.2d 577, 578 (1935). Interpretation of an insurance contract begins with the text of the policy itself. "[T]he words employed in insurance policies, if clear and unambiguous, should be given their plain and ordinary meaning." Nationwide Mut. Ins. Co. v. Nolan, 10 S.W.3d 129, 131 (Ky. 1999).  Unambiguous contract terms are interpreted by looking only to "the four corners of the document to determine the parties' intentions." Kentucky Shakespeare Festival, Inc. v. Dunaway, 490 S.W.3d 691, 695 (Ky. 2016) (internal citations omitted).

Where a true ambiguity exists, "ambiguous terms are to be construed against the drafter and in favor of the insured . . ." Id. (internal citations omitted).  However, "we must also give the policy a reasonable interpretation, and there is no requirement that every doubt be resolved against the insurer." Id. (cleaned up) (internal citations omitted).  Where not defined in the policy, or not fully defined, contracts terms "should be interpreted in light of the usage and understanding of the average person." Stone v. Kentucky Farm Bureau Mut. Ins. Co., 34 S.W.3d 809, 810-11 (Ky. 2000) (citing Fryman v. Pilot Life. Ins. Co., 704 S.W.2d 205 (Ky. 1986)).

## Policy Provisions at Issue

### Insurable Interest clause

Interpretation of any policy of insurance must begin with an examination of the subject of the insurance or the "insurable interest."  A party has an insurable interest in property when the party derives a clear pecuniary benefit from its preservation and, conversely, a pecuniary loss from

its destruction.  Batchelor v. Allstate Prop. & Cas. Ins. Co., No. 2018-CA-000387-MR, 2019 Ky.

App. Unpub. LEXIS 560, at *8 (Ky. App. July 26, 2019).  Here, the policy defines Century's

insurable interest as:

> On goods and/or merchandise and/or cargo and/or interest of all descriptions, that being the property of the insured and/or for which they are responsible or which they may require to insure and/or incidental to their business including but not limited to Coke, Alumina, Aluminum products and related materials shipped in and/or over.  Further including increased value whether by reason of liability for and/or payment of freight and/or duty and/or other charges on arrival or otherwise.  Including Consequential loss as detailed elsewhere herein.

(DN 1-2 at p. 4).  The parties agree that the policy afforded Century an insurable interest in the

alumina shipped from Louisiana to the production plants in Kentucky.  Underwriters points to an

additional provision imposing a qualifier on the coverage:

> Subject to the American Institute Cargo Clauses (Sept. 1, 1965) 32B-10 but with Clause No. 3 amended to read as follows:-
>
> "Against all risks of physical loss of or damage to the subject-matter insured from any external cause."

(Id. at p. 5).[2]

Extra Expense Clause

The policy contains a provision affording specific benefits if the insured incurs additional

expense in transporting the cargo necessitated by an obstruction to delivery.  The policy provides:

> Notwithstanding anything herein to the contrary this insurance is also to indemnify the insured for up to USD 1,000,000 each and every loss and in the aggregate per annum in respect of additional expenses incurred by the insured in attempting to prosecute an intended voyage covered hereunder whether such attempt may ultimately prove successful or otherwise (including but not limited to extra chartering costs and/or storage costs and/or transhipment

---

[2] Neither party has discussed what coverages are afforded under the American Institute Cargo Clauses incorporated by reference in the policy or the impact of amendment to Clause No. 3 thereof.  Consequently, the undersigned is left to consider this policy provision standing alone.

costs and/or guarantees and all other forwarding costs including by any alternative means of conveyance) as a result of one or more of the following occurrences:

(a) the vessel and/or conveyance on which the cargo is being carried or is intended to be carried being arrested, restrained (including but not limited to restriction of access to port(s) and/or place(s) of loading and/or discharge and/or any other area in-between), detained and/or otherwise delayed for any time period and as a result of any reason whatsoever, excluding however financial default and/or insolvency of the insured.

(Id. at p. 11).

Underwriters does not contest that Century's additional shipping expenses necessitated by the lock closures were a covered loss under this policy provision and it paid Century the limits of coverage afforded by this clause. It is Underwriters' position, however, that this is the only provision in the policy providing benefits for Century's extra transportation costs.

**Underwriters' Holistic Interpretation of Additional Policy Provisions**

In this case, the cargo policy insures against risk of physical loss or damage to the alumina. Century contends that other policy provisions, when read in a "holistic" manner with an eye toward the policy as a whole, demonstrate that it is entitled to additional payment for the extra transportation costs. Century describes these provisions as working together to provide coverage for alternative transportation costs and related expenses when "cargo is lost because it is fortuitously detained" (DN 107 at p. 8). These are the Sue and Labour[3] clause (DN 1-2 at p. 27), the Shipping Expense clause (Id. at p. 26-27) and the Marine Consequential Loss clause (Id. at p. 15). These will be addressed in the following discussion.

---

[3] The policy utilizes the British English spelling.

### Discussion

An initial question in resolving the motion is whether evidence beyond the four corners of the policy should be considered.  Underwriters has cited expert opinion and lay witness testimony as to the operation of the various policy provisions.  Century does not contend that any of the terms of the policy are ambiguous (*see* DN 107 at p. 18), and the undersigned likewise concludes that the terms are unambiguous.  As such, a written instrument is to be enforced strictly according to its terms and meaning discerned from the four corners of the agreement without resort to extrinsic evidence.  Smithfield Farms, LLC v. Riverside Developers, LLC, 566 S.W.3d 566, (Ky. Ct. App. 2018).

The fundamental question is the scope of coverage for Century's transportation expenses necessitated by the sporadic closures of locks on the Ohio River.  The parties agree that the policy covers alumina as cargo in transit from Louisiana to the plants in Kentucky insuring it against the risk of damage or loss.  They also agree that Century's additional transportation costs are covered up to the special limits provided under the Extra Expense clause.  Where they diverge is over coverage for additional transportation costs beyond those compensated under the Extra Expense clause.  Underwriters characterizes the policy as otherwise limited to compensation for damage to, or loss of, the alumina cargo, which in this instance it contends did not occur.  Century points to the possibility that if the alumina was not delivered in a timely manner, it could experience a pot-line freeze which it characterizes as an "existential crisis" for the aluminum plants.  It argues that the various policy provisions, read as a whole, demonstrate that additional transportation expenses would be compensable to avoid this loss.

The Insurable Interest provision of the policy (DN 1-2 at p. 4) identifies the object of the insurance as shipped cargo, specifically alumina in this instance.  The risk insured against is "risks

of physical loss of or damage . . . from any external cause" (Id. at p. 5).  Century argues that the unavailability of lock transit constituted a "loss" of the cargo.  It does so by harkening to another provision in the policy denoted as "Risks Covered" (Id. at p. 26).  This portion of the policy archaically describes the risks covered as "men-of-war, fire, enemies, pirates, rovers, thieves, jettison, letters of mart and countermart, surprisals, takings at sea, arrests, restraint and detainments of all Kings, Princes and People of what nation . . . that have or shall have come to the hurt, detriment or damage of the said goods and merchandise and ship, or any part thereof" (Id.).  Century cites Intermetal Mexicana, S.A. v. Insurance Co. of N. Am., 866 F.2d 71 (3rd. Cir. 1989) for the proposition that "loss" of property includes the absence of possession or control.  In that case, however, the cargo was heavy equipment which was seized and taken away.  Id. at 74.  The court found that the cargo was lost because the owner was completely deprived of control of the cargo and never regained possession.  Id. at 76.  Here the cargo was never "lost."  Even though delivery was delayed by the fact that the locks were intermittently closed, Century was at all times in control of the barges and cargo and could, as it did, reroute them to other offloading facilities.  Moreover, to the extent the alumina was restrained or detained, it was not by virtue of action by any "Kings, Princes and People."  The action of the Corps of Engineers in closing the locks to all river traffic did not operate as any manner of seizure of the barges or cargo, nor was there any "hurt, detriment or damage" to the cargo.

Returning to the Insurable Interest portion of the policy, Century points to the provision that extends coverage to "[i]ncluding Consequential loss as detailed elsewhere herein" (DN 1-2 at p. 4).  Century contends that the Marine Consequential Loss section (Id. at p. 19) addresses such consequential losses.  The Marine Consequential Loss identifies risks covered as:

> This insurance covers up to USD 3,000,000 in respect of standing charges, debt service, or profit ascertained in the of manner hereinafter provided, during the

indemnity period of 15 months, due to the production during each period falling short of the standard production (hereinafter defined) as a result of loss of or damage to or delay in the delivery of the property as described in the schedule hereto (or any part thereof) caused by:

**Risk Clause**

    1.1    a risk which would be covered under the terms, clauses and conditions of this insurance.

(Id. at p. 15).  Century characterizes this as a form of business interruption insurance.  In this regard, it is correct.  The policy covers damage or loss of the cargo.  Had the cargo been damaged or lost and Century experienced a loss of revenue due to decreased production, then the loss would be compensable under the policy.  However, the cargo was not lost or damaged.  Moreover, even if one interpreted the section as providing benefits for delayed delivery not caused by any damage to the cargo, the definition of "standard production" is "the revenue of the goods as they were reasonably expected to be produced during the Indemnity period but for the contingency" (Id. at p. 18).  Century does not contend that because of a delay it experienced a decrease in aluminum production.

The Sue and Labour Clause does not extend coverage to Century's additional shipping expenses.  The policy provides:

> It is agreed that in the case of actual or imminent loss, damage, cost or expense, it shall be lawful and necessary for the Insured, their Factors and Assigns, to sue, labour and travel for, in and about the defense, safeguard and recovery of the interests insured hereunder, or any part thereof, or to incur such other expenses as are reasonable and/or necessary for the purpose of reducing or attempting to reduce any potential loss or liability under this Contract without prejudice to this insurance, and subject always to the terms, conditions, limitations and exclusions of this Insurance, the charges thereof shall be borne by the Insurers.  It is further agreed that no acts of the Insurers or the Insured in recovering, saving or preserving the interests insured shall be considered as a waiver or acceptance of abandonment.  The insurers hereon agree to pay the charges described above in addition to amounts otherwise recoverable hereunder, subject however to the applicable limits of this insurance as contained herein or endorsed hereto, which would operate so as

10

> to restrict the amount of such charges payable by the Insurers
> hereon.

(Id. at p. 27).  "Sue and labor clauses are intended to encourage an insured to take measures to preserve the subject matter of the insurance policy, in this case the cargo. . . .  In exchange, the insurer must reimburse the insured for the expense it incurs, since the insured has acted to benefit the insurer by averting or mitigating an otherwise recoverable loss."  Int. Commodities Export Corp. v. Am. Home Assur. Co., 701 F. Supp. 448, 452 (S.D.N.Y. 1988) (citations omitted). Century notes that the Sue and Labour Clause obligates it to take action to avoid "imminent loss" (DN 1-2 at p. 27).  Century contends the possibility a pot-line freeze would occur if delivery of the alumina was sufficiently delayed constituted an imminent loss and it was obligated to take preventative measures "reducing or attempting to reduce any potential loss or liability under this Contract" (Id.).  However, the object of the contract was insuring the alumina against physical loss or damage, not insuring Century's plants against pot-line freeze.  "[T]the immediate source of an insurer's potential exposure to loss must be considered when determining whether the sue and labor clause requires reimbursement.  Grounding the clause in the subject matter of the policy is necessary to prevent the clause from becoming an all-purpose indemnity clause for which the parties have not contracted."  Hvide Marine Int'l v. Employers Ins. of Wausau, No. 88 CIV 1523 (LBS), 1989 U.S. Dist. LEXIS 13528, *19 (S.D.N.Y. Nov. 15, 1989) (citation omitted).  Century's shipping expenses were not incurred in the course of protecting the alumina from physical loss or damage, such as transferring the cargo from a sinking vessel or re-routing the cargo to avoid a hurricane.

Finally, the Shipping Expenses clause does not extend coverage to Century's additional shipping expenses necessitated by the lock closures.  Specifically, the clause reads:

> When the subject matter insured is not delivered to the destination contemplated due to circumstances beyond the control of the Insured this insurance also to pay reasonable direct charges incidental to shipping which have been or may be incurred by the insured.

(DN 1-2 at p. 26-27).  Thus, under this clause, coverage is provided for "reasonable direct charges incidental to shipping."  The risk insured against is the cost of shipping expenses when "the subject matter insured is not delivered to the destination contemplated due to circumstances beyond the control of the Insured . . . ." (Id.).  Had the alumina not been delivered for reasons beyond Century's control, then Century would not have realized the benefit of the expenses it incurred in attempting to have it delivered and thereby sustained a loss.  The alumina was, however, ultimately delivered to Century's plants.

In sum, the undersigned concludes that Underwriters has paid all that to which is obligated under the policy—namely the limits of coverage under the Extra Expense Clause.  This resolves Century's claim for declaratory judgment as to Underwriter's obligation for benefits under the contract of insurance (DN 1, p. 7-8).

Underwriters has further moved for summary judgment on Century's breach of contract claim (Id. at p. 8).  Under Kentucky law, a plaintiff establishing breach of contract must establish "(1) the existence of a valid contract; (2) breach of that contract; and (3) damages or loss to the plaintiff."  Seye v. Richardson, No. 2:14-CV-38, 2015 U.S. Dist. LEXIS 81090, at *1 (E.D. Ky. June 23, 2015) (citation omitted).  The declaratory finding in favor of Underwriters establishes that it has not breached its obligation to payment of contractual benefits, and summary judgment on that portion of Century's Complaint is appropriate.

## <u>ORDER</u>

**WHEREFORE**, Underwriters' motion for partial summary judgment, DN 100 is **GRANTED**.  Declaratory judgment under Count I of Century's Complaint (DN 1) is rendered in favor of Underwriters on its obligation to make payment under the subject policy of insurance for covered losses.  Underwriters is granted summary judgment on Century's claim for breach of contract under Count II of the Complaint.  Century requested oral argument on the motion, however, the undersigned concludes oral argument would not be helpful and therefore the request for oral argument is denied.

April 24, 2023

**H. Brent Brennenstuhl**
**United States Magistrate Judge**

Copies:  Counsel

13